

**FILED & ENTERED**

**DEC 29 2021**

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY gonzalez  DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA
# LOS ANGELES DIVISION

| | |
|---|---|
| In re:    Michelle C. Mathis, Debtor. | Case No.:    2:19-bk-13660-ER<br>Adv. No.:    2:20-ap-01619-ER |
| Michelle C. Mathis,<br><br>Plaintiff,<br><br>v.<br><br>United States Department of Education,<br><br>Defendant. | **MEMORANDUM OF DECISION FINDING THAT DEBTOR IS NOT ENTITLED TO DISCHARGE HER STUDENT LOAN DEBT**<br><br>**TRIAL:**<br><br>Date:    September 29, 2021<br><br>Time:    9:00 a.m.<br><br>Location:   Ctrm. 1568<br>Roybal Federal Building<br>255 East Temple Street<br>Los Angeles, CA 90012 |

## I. Introduction

Michelle C. Mathis ("Debtor") seeks to discharge her obligation to repay student loan debt in the amount of $82,190.54 (the "Student Loan").[1] The United States Department of Education ("Defendant") asserts that Debtor will not be subjected to an undue hardship if she is required to repay the Student Loan.

---

[1] As described in greater detail below, $82,190.54 was the student loan balance as of September 1, 2021. The loan accrues interest at the rate of 5.63% per annum, or $10.67 per day.

Trial was conducted on September 29, 2021.[2] This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law pursuant to Civil Rule 52, made applicable to these proceedings by Bankruptcy Rule 7052.[3]

For the reasons set forth below, the Court finds that Debtor is not entitled to a discharge of the Student Loan, and will enter judgment in favor of Defendant.

## II. Admissibility of Exhibits

On February 4, 2021, the Court entered an order setting litigation deadlines and establishing procedures for the adjudication of evidentiary objections at trial [Doc. No. 34] (the "Evidence Procedures Order"). The Evidence Procedures Order required all parties to stipulate to the admissibility of exhibits whenever possible. It further provided:

> In the event any party cannot stipulate to the admissibility of an exhibit, that party must file a Motion in Limine which clearly identifies each exhibit alleged to be inadmissible and/or prejudicial. The moving party must set the Motion in Limine for hearing at the same time as the Pretrial Conference …. The failure of a party to file a Motion in Limine … shall be deemed a waiver of any objections to the admissibility of an exhibit.

Evidence Procedures Order at ¶ 3(h).

No Motions in Limine have been filed in accordance with the requirements of the Evidence Procedures Order. Accordingly, all exhibits offered by the parties shall be deemed admitted.

## III. Undisputed Facts

The parties have stipulated to the facts set forth in this section.[4] On November 13, 2017, Debtor executed a Promissory Note ("Note") to secure a Federal Direct Consolidation Loan (the "Student Loan") from Defendant. On December 11, 2017, proceeds of the Student Loan obtained pursuant to the Note were disbursed on Debtor's behalf by Defendant in the principal amounts of $28,654.66 and $40,555.36, at an interest rate of 5.63% interest per annum.

The Student Loan was made under loan guaranty programs authorized under Title IV, Part D of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087a, *et seq*. (34 C.F.R. § 685). As of December 15, 2020, the outstanding cumulative principal and interest balance on the Student Loan was $77,339.14. As of September 21, 2021, the outstanding cumulative principal and interest balance on the Student Loan reached $82,190.54 after Debtor's TEACH grants reverted into a loan and were added to the balance of the Student Loan. The Student Loan

---

[2] A transcript of the trial proceedings is available as Doc. No. 57 and is cited as "Tr."
[3] Unless otherwise indicated, all "Civil Rule" references are to the Federal Rules of Civil Procedure, Rules 1–86; all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037; all "Evidence Rule" references are to the Federal Rules of Evidence, Rules 101–1103; all "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California, Rules 1001-1–9075-1; and all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532.
[4] *See* Doc. No. 44 (Pretrial Stipulation), Doc. No. 46 (order adopting Pretrial Stipulation as the Pretrial Order), Doc. No. 49 (stipulation setting forth additional undisputed facts), and Doc. No. 50 (order approving stipulation setting forth additional undisputed facts).

permitted Debtor to borrow money to be used for educational benefits under a government insured student loan program.

Commencing on March 13, 2020 and through at least January 31, 2022, as a result of the CARES Act and subsequent extensions of emergency relief, Federal Student Aid, an office of Defendant, has provided temporary relief measures on federal student loans owned by Defendant. These relief measures include suspending borrowers' obligation to make loan payments, suspending collections activity on defaulted loans, and a 0% interest rate.

Defendant is the current holder of the Note and is authorized to enforce it. Debtor promised to repay all sums advanced under the Note, plus interest and other fees that may become due under the Note, including reasonable collections costs, court costs, and fees. The Note evidences student loans made, insured or guaranteed by a governmental unit, or made under a program funded in whole or in part by a governmental unit or nonprofit institution, within the meaning of § 523(a)(8).

Debtor has not made any payments on the Student Loan. The Student Loan accrues interest at a fixed rate of 5.63% per annum, or $10.67 per day.

Debtor is presently employed as an independent contractor for a food and shopping service. She has previously been employed as a special education instructional aide, a science teacher, a substitute teacher, an event promoter, a bartender, and has previously worked in product promotion.

Debtor is 32 years old, is not married, and has no dependents. She has an undergraduate degree from Smith College with a double major in neuroscience and behavioral psychology, and has a teaching credential.

## IV. Findings of Fact and Conclusions of Law

Section 523(a)(8) excepts from discharge the obligation to repay certain types of student loans, unless excepting the student loan indebtedness from discharge would impose an "undue hardship" upon the debtor. There is no dispute that the Student Loan at issue here falls within the scope of § 523(a)(8).

The statute does not define the term "undue hardship." The Ninth Circuit has adopted the Second Circuit's *Brunner* test for determining undue hardship. *United States Student Aid Funds, Inc. v. Pena (In re Pena)*, 155 F.3d 1108, 1111 (9th Cir. 1998) (adopting *Brunner v. New York State Higher Educ. Svcs. Corp. (In re Brunner)*, 831 F.2d 395 (2nd Cir. 1987)). To except a student loan from discharge, the debtor must "prove all three *Brunner* prongs by a preponderance of the evidence." *Roth v. Educ. Credit Mgmt. Corp. (In re Roth)*, 490 B.R. 908, 917 (B.A.P. 9th Cir. 2013). The three *Brunner* prongs are as follows:

1) [T]hat the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
2) [T]hat additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and
3) [T]hat the debtor has made good faith efforts to repay the loans.

*Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987).

If the debtor fails to satisfy any one of the three *Brunner* prongs, "the bankruptcy court's inquiry must end there, with a finding of no dischargeability." *Rifino v. United States (In re Rifino)*, 245 F.3d 1083, 1088 (9th Cir. 2001). "Section 523(a)(8) was enacted to maintain the

credibility and stability of the student loan program and to assure future generations of students a viable loan program." *Levernier v. Student Loan Marketing Ass'n (In re Levernier)*, 244 B.R. 458, 461–62 (Bankr. C.D. Cal. 1999), *aff'd,* 307 B.R. 684 (C.D. Cal. 2004). "It seems universally accepted that 'undue hardship' contemplates unique and extraordinary circumstances. Mere financial adversity is insufficient, for that is the basis of all petitions in bankruptcy." *Naranjo v. Educ. Credit Mgmt. Corp. (In re Naranjo)*, 261 B.R. 248, 253 (Bankr. E.D. Cal. 2001). The requirement that debtors demonstrate "undue hardship" to obtain the discharge of a student loan "indicates that Congress viewed garden-variety hardship as insufficient excuse for a discharge of student loans." *Pena*, 155 F.3d at 1111 (internal citation omitted).

The continued applicability of the *Brunner* standard has been affirmed by the Ninth Circuit Bankruptcy Appellate Panel in a published opinion as recently as 2019. *See Hurley v. United States (In re Hurley)*, 601 B.R. 529, 535 (B.A.P. 9th Cir. 2019) ("In *Pena* … the Ninth Circuit adopted the three-pronged test set forth in *Brunner*, to determine whether the undue hardship standard has been met. The burden of proving undue hardship is on the debtor, and the debtor must prove all three elements before discharge can be granted."). In a concurring opinion issued in 2013, Judge Pappas criticized *Brunner*, but recognized that it remained binding upon bankruptcy courts unless and until the issue was revisited by the Ninth Circuit. *See Roth*, 490 B.R. 908, 920 (B.A.P. 9th Cir. 2013) ("I write separately to highlight that the analysis required by *Pena/Brunner* to determine the existence of an undue hardship is too narrow, no longer reflects reality, and should be revised by the Ninth Circuit when it has the opportunity to do so. Put simply, in this era, bankruptcy courts should be free to consider the totality of a debtor's circumstances in deciding whether a discharge of student loan debt for undue hardship is warranted.").

As explained in *Rifino*, the Court would be required to hold that Debtor's student loan debt was non-dischargeable if Debtor had failed to prove even *one* of the *Brunner* prongs. *Rifino*, 245 F.3d at 1088. Here, as discussed below, Debtor has failed to prove *all three* of the *Brunner* prongs.

### A. Debtor Can Maintain a Minimal Standard of Living if Required to Repay the Student Loan

To except a student loan from discharge, the debtor must establish "'that she cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans.'" *Pena*, 155 F.3d 1108, 1111 (9th Cir. 1998) (quoting *Brunner*, 831 F.2d at 396). "To meet this requirement, the debtor must demonstrate more than simply tight finances. In defining undue hardship, courts require more than temporary financial adversity, but typically stop short of utter hopelessness. The proper inquiry is whether it would be 'unconscionable' to require the debtor to take steps to earn more income or reduce her expenses." *Biranne v. Penn. Higher Educ. Assistance Agency (In re Birrane)*, 287 B.R. 490, 495 (B.A.P. 9th Cir. 2002).

In determining what is necessary to maintain a minimal standard of living, the Court may consider the Internal Revenue Service Collection Financial Standards (the "IRS Standards"), which the IRS uses to assess a taxpayer's ability to pay delinquent taxes. However, the IRS Standards are not dispositive and "may lead to an erroneous calculation in the § 523(a)(8) context for a number of reasons." *Howe v. Educ. Credit Mgmt. Corp. (In re Howe)*, 319 B.R. 886, 893 (B.A.P. 9th Cir. 2005).

On August 30, 2021, Defendant sent Debtor a letter advising her of repayment options for the Student Loan (the "Repayment Letter").[5] As set forth in the Repayment Letter, Debtor is eligible for the Income Based Repayment Plan ("IBR") and the Revised Pay As You Earn Repayment Plan ("REPAYE"). At trial, Debtor acknowledged that she was aware of her ability to take advantage of either the IBR or REPAYE plans.[6]

Under REPAYE, Debtor would be required to make payments equal to 10% of her discretionary income.[7] For purposes of REPAYE, "discretionary income" is defined as the difference between the Debtor's income and 150% of the federal poverty guideline.[8] If income falls below 150% of the poverty level, no payments are required.[9] The REPAYE payment is recalculated annually based on financial information reported on a federal tax return.[10]

Under IBR, Debtor would be required to make payments up to a maximum of 15% of her income in excess of 150% of the federal poverty level.[11] No payments would be required if Debtor's income was less than 150% of the poverty level.[12]

Debtor currently works as a full-service personal shopper.[13] As she explained at trial, "that means I get a personal shopping list, I go to a store. I drive to a store, shop there and drop off at people's homes …. It's a full-service drop-off."[14]

Debtor did not introduce any written evidence substantiating her income, such as tax returns or pay stubs. In fact, in response to Defendant's interrogatory inquiring about her income over the past five years, Debtor objected, asserting that the interrogatory "violates [Debtor's] right to privacy" and that "such information regarding annual income is privileged and protected under state and federal law."[15] At her deposition,[16] Debtor testified that her total income was between $36,000 to $40,000 during 2018; between $40,000 to $50,000 during 2019; and approximately $50,000 during 2020.[17] She testified that during 2021, she was "making somewhere between $4,000 to $6,000" per month working part-time[18]; extrapolating this monthly figure for the entire year would put Debtor's 2021 income at between $48,000 and $72,000.

---

[5] Defendant's Ex. H.
[6] Tr. 57:21–58:10 (Debtor's testimony).
[7] *See* Repayment Letter (Defendant's Ex. H).
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*
[12] *Id.*
[13] Tr. 53:25–54:2 (Debtor's testimony).
[14] *Id.* at 54:2–5 (Debtor's testimony).
[15] Plaintiff Michele C. Mathis' Answers to First Set of Interrogatories to Defendant (Debtor's Ex. 2).
[16] Debtor did not offer any testimony at trial regarding her income.
[17] Debtor's Depo. at 48:2–49:1 (Defendant's Ex. Q).
[18] *Id.* at 49:6–12.

In sum, during the past several years, Debtor's annual income has ranged from between approximately $35,000 and $75,000. The following table sets forth the monthly payments Debtor would be required to make toward the Student Loan under the IBR and REPAYE plans[19]:

| Adjusted Gross Income | Monthly Payment Under REPAYE (10% of discretionary income) | Monthly Payment Under IBR (15% of discretionary income) |
|---|---|---|
| $25,000.00 | $47.33 | $71.00 |
| $30,000.00 | $89.00 | $133.50 |
| $35,000.00 | $130.67 | $196.00 |
| $40,000.00 | $172.33 | $258.50 |
| $45,000.00 | $214.00 | $321.00 |
| $50,000.00 | $255.67 | $383.50 |
| $55,000.00 | $297.33 | $446.00 |
| $60,000.00 | $339.00 | $508.50 |
| $65,000.00 | $380.67 | $571.00 |
| $70,000.00 | $422.33 | $633.50 |
| $75,000.00 | $464.00 | $696.00 |

Debtor's monthly expenses are as follows:

1) $1,985 to rent an apartment located at 74 Seastar Court, Dana Point, CA 92629. The rent does *not* include utilities.[20]
2) $590 to lease a 2021 Toyota Corolla.[21]
3) $160 to insure the 2021 Toyota Corolla.[22]
4) $600 to $800 for clothing.[23]
5) $260 to $400 for food.[24]
6) $200 for personal care items.[25]
7) $275 in credit card payments.[26]
8) $86 for cell phone service.[27]
9) $72 for home internet service.[28]

---

[19] The information in the table was calculated by Cristin Bulman, a Loan Analyst who works for Defendant.
[20] Tr. 50:18–22 (Debtor's testimony).
[21] *Id.* at 47:14–18 (Debtor's testimony).
[22] *Id.* at 47:20–22 (Debtor's testimony).
[23] *Id.* at 52:1–11 (Debtor's testimony).
[24] *Id.* at 49:12–18 (Debtor's testimony).
[25] *Id.* at 49:1–2 (Debtor's testimony).
[26] *Id.* at 49:4–8 (Debtor's testimony). Debtor did not testify as to whether she uses the credit card to fund other monthly expenses or to pay down post-discharge debt. Of course, to the extent Debtor uses the credit card for monthly expenses—such as to buy groceries—the credit card payments would be duplicative of those expenses.
[27] *Id.* at 48:10–18 (Debtor's testimony).
[28] *Id.* at 48:19–21 (Debtor's testimony).

  10) $250 in out-of-pocket healthcare expenses. (Debtor receives medical insurance through Medi-Cal.)[29]

Since April 2017, Debtor's monthly rental expenses have more than doubled, as shown by the following table[30]:

| Dates Debtor Lived at Address | Address | Monthly Rent |
|---|---|---|
| June 2013 to April 2017 | 233 West Amar St., San Pedro | $850 |
| April 2017 to April 2018 | 22130 Victory Blvd., Woodland Hills | $1,468 |
| April 2018 to September 2019 | 2029 Olympic Blvd., Santa Monica | $1,767 |
| October 2019 to January 2020 | 6330 Randy Ave., Woodland Hills | $1,529 |
| January 2020 to March 2021 | 5535 Westlawn Ave., Los Angeles | $1,607 |
| March 2021 to Present | 74 Seastar Court, Dana Point | $1,985 |

The Court finds that Debtor could easily repay the Student Loan, under either the REPAYE or IBR plans, if she were willing to modestly reduce her current expenses. It would not even be necessary for Debtor to reduce her expenses across-the-board—a reduction in a single expense category would be sufficient to fund the payments required under the REPAYE or IBR plans. For example, if Debtor reduced her housing budget to the amount she spent between April 2017 and April 2018 (when she lived in Woodland Hills), she would have enough income to repay the Student Loan—without reducing *any* of her other expenses. Similarly, Debtor could repay the Student Loan if she cut her $600–$800 monthly clothing budget roughly in half—again without reducing *any* other expenses. In short, Debtor would not have to make significant sacrifices to repay the Student Loan, and could repay the Student Loan while simultaneously enjoying a standard of living markedly in excess of the "minimal" standard of living that is a prerequisite to student loan dischargeability. *Pena*, 155 F.3d at 1111.

**B. There Are No Additional Circumstances Indicating that Debtor Will Face Difficulty Repaying the Student Loan Throughout a Significant Portion of the Repayment Period**

 The second *Brunner* prong "requires the debtor to show 'that additional circumstances exist indicating that this state of affairs [Debtor's inability to repay the Student Loan while simultaneously maintaining a minimal standard of living] is likely to persist for a significant portion of the repayment period of the student loans.' Stated in the affirmative, this part of the *Brunner* test considers whether there is a likelihood that the debtor's financial situation will improve sufficiently to permit the debtor to repay the loans." *Nys v. Educ. Credit Mgmt. Corp. (In re Nys)*, 308 B.R. 436, 442 (B.A.P. 9th Cir. 2004), *aff'd,* 446 F.3d 938 (9th Cir. 2006) (internal citation omitted).

 Debtor cannot satisfy this prong in view of the Court's finding that Debtor could repay the Student Loan while still maintaining a standard of living markedly exceeding the minimum threshold required to justify dischargeability. Moreover, Debtor's testimony at trial showed that it is likely that her income will meaningfully increase in the coming years.

---

[29] Debtor testified that her yearly-out-of-pocket healthcare expenses were approximately $3,000, which breaks down to $250 per month. *Id.* at 46:8–13.

[30] *Id.* at 49:20–50:22 (Debtor's testimony).

Debtor worked as a long-term substitute teacher for the Santa Monica–Malibu Unified School District ("SMMUSD") between January 2017 and 2018.[31] Debtor testified that she left this position because SMMUSD wrongfully retaliated against her after she reported misconduct by another teacher.[32] Debtor filed a whistleblower retaliation complaint against SMMUSD in August 2020,[33] which she settled for a payment of $25,000.[34] Debtor achieved the $25,000 settlement without representation by an attorney.[35]

In an attempt to satisfy the second *Brunner* prong, Debtor testified that she has experienced many challenges—including anxiety and depression associated with her employment with SMMUSD[36] and difficulties obtaining employment because background checks run by prospective employers showed a conviction for resisting arrest, even though that conviction had subsequently been vacated.[37] Debtor intended this testimony to demonstrate an inability to repay the Student Loan that was likely to persist. However, the evidence showed exactly the opposite—namely, Debtor's ability to earn income sufficient to repay the Student Loan even in the face of significant challenges. For example, Debtor testified that while working for SMMUSD, she met with a licensed clinical social worker and obtained authorization for an emotional support animal.[38] The summary of Debtor's visit prepared by the social worker states that Debtor's symptoms included depression and anxiety, edginess and restlessness, irritability, and disturbed sleep.[39] Notwithstanding these difficulties, Debtor was still able to perform her responsibilities at SMMUSD, as reflected by Debtor's own testimony:

> [A]fter the emotional support animal letter, I had a report that stated I manifested edges—edginess, restlessness, irritability and worries about my safety…. Including a depressed mood, isolation and avoiding social situation[s], low energy, low motivation and poor concentration. This was a period of time in which I was teaching full time. I was even doing a supplemental summer program run by the Parent/Teacher Association and which gave extracurricular activities such as classroom learning modules and which I created—created a curriculum to create a science-based learning environment for middle school students, all while being restless, all while being—having poor concentration, all while being in a depressive and anxiety—and having anxiety ….

Tr. 32:20–33:9.

Perhaps it is unfair that Debtor's grit, determination, and ability to persevere through difficult circumstances compels a finding that the Student Loan is non-dischargeable. The Court, however, must apply § 523(a)(8) as drafted by Congress and interpreted by the courts. Only a

---

[31] *Id.* at 44:24–45:10 (Debtor's testimony).
[32] *Id.* at 34:6–35:4 and 44:21–45:10 (Debtor's testimony).
[33] Debtor's Ex. 8 (copy of whistleblower complaint).
[34] Tr. at 45:11–19 (Debtor's testimony).
[35] *Id.* at 46:2–7 (Debtor's testimony).
[36] *Id.* at 18:23–19:3 and 31:23–33:13 (Debtor's testimony).
[37] *Id.* at 28:11–30:13 (Debtor's testimony regarding the conviction that was subsequently vacated); Debtor's Ex. 6 (court order showing vacatur of the conviction, accompanied by an FBI background report still showing the conviction).
[38] Tr. 32:7–17 (Debtor's testimony).
[39] Debtor's Ex. 7 (summary of visit dated July 6, 2017); Tr. at 32:23–.

"[s]erious mental … disability of the debtor … which *prevents employment or advancement*" amounts to an "additional circumstance" satisfying the second *Brunner* prong. *Nys*, 308 B.R. at 436 (emphasis added). Emotional and mental challenges which Debtor succeeds in overcoming do not qualify.

Debtor testified that she is taking classes to obtain a real estate license, with the objective of embarking in a new career that would increase her income.[40] Debtor has been able to achieve her current income of "somewhere between $4,000 to $6,000" per month working only part-time.[41] Despite the fact that she has no formal legal training, Debtor succeeded in obtaining a settlement of $25,000 from SMMUSD without being represented by an attorney. In short, Debtor's innate talent, determination, and ability to persevere through difficult circumstances show that it is likely her income will increase meaningfully in the future.

**C. Debtor Has Not Made a Good Faith Effort to Repay the Student Loan**

The third *Brunner* prong requires that "the debtor has made good faith efforts to repay the loans." *Brunner*, 831 F.3d at 396. "The 'good faith' test encompasses the notion that a 'debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.' 'Factors to be considered include the number of payments [the d]ebtor made, attempt to negotiate with the lender, proportion of loans to total debt, and possible abuse of the bankruptcy process.' A number of cases, including *Brunner* itself, have concluded that a debtor's effort—or lack thereof—to negotiate a repayment plan is an important indicator of good faith." *U.S. Dep't of Educ. v. Wallace (In re Wallace)*, 259 B.R. 170, 185 (C.D. Cal. 2000) (internal citations omitted). In *Mason v. Educ. Credit Mgmt. Corp.*, the Ninth Circuit held that a debtor who had not diligently pursued an income-based repayment plan did not satisfy the good-faith prong:

> Finally, while Mason appears to have made some previous efforts to negotiate repayment of his debt, his efforts have been inadequate. The record demonstrates that Mason could have attempted renegotiation of his debt under the ICRP, but failed to pursue this option with diligence.

*Mason*, 464 F.3d 878, 885 (9th Cir. 2006).

Debtor has not made a single payment on the Student Loan.[42] She has been advised of her eligibility for the IBR and REPAYE plans, but has not elected to take advantage of either plan.[43] Debtor's testimony at trial showed that she had not made any payments on the Student Loan because she believed that being required to repay the Student Loan would be inequitable in view of the challenges she had experienced with respect to obtaining employment in the field of education:

> My post-secondary education has not served me as well as I thought it should in the years preceding. I was faced with many complications, not just financial but emotional,

---

[40] Tr. 53:10–24 (Debtor's testimony).
[41] Debtor's Depo. at 49:2–12 (Defendant's Ex. Q).
[42] *See* Section III, "Undisputed Facts," above.
[43] Tr. 57:21–58:10 (Debtor's testimony).

> mental and also I had to deal with many of these issues being over the heads of most relatives and associates that were unable to help me through these times….
>
> And at this point I am tired of my path being met with major hurdles, dangerous hurdles. Some [of the] conditions I have [had] to go through are inhumane on many levels….
>
> So at this stage if I'm to owe something I would gladly—when I signed those promissory notes I had no inclination of ever saying, no, I will not repay those…. I think I was very fiscally responsible with my decisions to borrow this entire time. But the amount that is owed and the time that was taken from me, the experience that I was denied credit for is something that I have to take into consideration and also my costs of living in which I'm responsible for is also something I have to take into consideration before I hand over a dime of money that I don't necessarily have at this moment to give.
>
> And, you know, I'm not saying that I can self—give a self-fulfilling prophecy of hopelessness. But what I am saying, I will have a long path of financial recovery before I can even think about giving back to my student loans.

Tr. at 15:3–6, 19:13–16, and 19:25–20:16 (Debtor's testimony).

Debtor's deposition testimony also demonstrated that she had made no attempt to repay the Student Loan because she believed that being required to repay was unfair given the issues she had experienced with her employment:

> **Question (by Defendant):** So is it your belief, then, that you only have to pay back the loans only if they benefited you beyond paying for the education?
>
> **Answer (by Debtor):** … But if I'm completing a program and there is nothing wrong with my ability to work in the field, I would be expecting to pay them back with the money I'm earning as whatever I'm going to school for. And I guess that's an American thing where that's not the case, but in most other countries, whatever you are trained in, that's what you go into, and there's no *if*s, *and*s, or *but*s about it.
>
> But I would say … you would hope that … whatever you get a loan for is what is going to assist you to repay it. You know, so we're, like, here trying to … give you the educational benefit of repaying us. But if we send you through a maze in order to get to a decent income where now you just need to afford to survive, how likely is it that I'm going to be able to get any repayment out of you in a decent period of time? …
>
> **[Questions omitted]**
>
> I feel like the benefit from my education had more to do with my own personal drive than any supplemental assistance I got from outside of there. You know, for you to just go through the work alone and someone just slap a badge and say, "Oh, we helped you through this," and didn't help you through anything, it's just kind of like—you know, I can sit and pish posh with a bunch of people who already have secured situations and not necessarily have to deal with the struggle of figuring out how to survive or what wages and how to handle their own finances and represent themselves.
>
> It's just, you know, at this point, how hopeful I feel towards—like, *how little I feel I benefited from these endeavors has added to my resistance to repayment as well*, as well as adverse circumstances I endured during a period that, you know, a network at their

level could have easily intervened and said—like, could have gotten a position somewhere, you know, that would have benefited me more than going back and forth.

You know, it's, like, kind of—a bit like—it's kind of having, like, an overarching giant trying to take from you while you have to put your hands out to a midget. And that's essentially—you know what I mean? So it's essentially like, "Okay, you guys have your hands out to me while I have my hands out to the small guy." And it's, like, you know—it's, like, you know, it should be the other way around. The small guy should have his hands out to me while I should have my hands out to someone who has more resources…

**[Questions omitted]**

And I think just, like, the fact that my situation, due to my, you know, occupational, like, issues and just—like, I felt as though my situation was—came out more unstable than it could have been entering it, and I did not have the right supports through these programs to effectively—to effectively deal with the fact that, like, there needs—do you know what I mean? There wasn't really a component to assist with the success rate of entering the program, completing the program, and getting into any profitable field. And that, to me, is the essence of a higher education. It's the network of support that is supposed to be geared towards ensuring that you have success rates.

Debtor's Depo. at 116:5–117:1, 113:19–114:24, and 122:20–123:8 (emphasis added) (Defendant's Ex. Q).

The Court finds that Debtor has not made a good-faith effort to repay the Student Loan. Instead, as illustrated by the testimony quoted above, Debtor has not made a single payment on the Student Loan because she believes that being required to repay the Student Loan would be inequitable.

**D. Debtor is Not Eligible for a Partial Discharge of the Student Loan**

The Court has the ability to partially discharge the Student Loan:

> A partial discharge of student loan debt is also permissible. Either the debtor or the lender may seek a partial discharge. Typically the debtor presents evidence of current income and expenses and any other relevant facts under *Brunner* and the lender presents any contrary evidence. The bankruptcy court then determines, based on the parties' evidence, whether the debtor can afford to pay all, part, or none of the student loan debt without undue hardship.

*Carnduff v. U.S. Dep't of Educ. (In re Carnduff)*, 367 B.R. 120, 128 (B.A.P. 9th Cir. 2007) (internal citations omitted).

To grant a partial discharge, the Court "must first find that the portion being discharged satisfies the requirements under § 523(a)(8)." *Saxman v. Educ. Credit Mgmt. Corp. (In re Saxman)*, 325 F.3d 1168, 1175 (9th Cir. 2003).

As set forth above, Debtor has failed to prove any of the *Brunner* prongs with respect to the entirety of the Student Loan. It necessarily follows that Debtor is also ineligible to receive a partial discharge of the Student Loan.

**E. Application of the *Brunner* Test Does Not Violate Debtor's Right to Equal Protection**

Debtor argues that application of the *Brunner* test to determine the dischargeability of the Student Loan violates the Equal Protection Clause of the Fourteenth Amendment. Debtor's theory is that her right to equal protection is infringed because some circuits do not follow *Brunner* and instead conduct the § 523(a)(8) "undue hardship" inquiry using a "totality of the circumstances" test.

Debtor is correct that there is a circuit split with respect to assessing "undue hardship" under § 523(a)(8). The First and Eighth Circuits use a "totality of circumstances" test to determine undue hardship. *See Long v. Educ. Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 553 (8th Cir. 2003) (affirming the "totality of the circumstances" test and declining to follow *Brunner*, while acknowledging that other circuits have adopted *Brunner*). The Eighth Circuit has described the "totality of the circumstances" test as "less restrictive" than the *Brunner* test. *Long*, 322 F.3d at 554. Therefore, if Debtor lived within the First or Eighth Circuits, it would be easier for her to discharge the Student Loan.

Does this geographical disparity in the treatment of the Student Loan violate Debtor's right to equal protection? As a threshold matter, the Court notes that it is the equal protection component of the Fifth Amendment—not the Equal Protection Clause of the Fourteenth Amendment—that is the governing law. The Fourteenth Amendment's Equal Protection Clause applies only to states, not the federal government. However, the difference is immaterial because "the Fifth Amendment imposes on the Federal Government the same standard required of state legislation by the Equal Protection Clause of the Fourteenth Amendment." *Schweiker v. Wilson*, 450 U.S. 221, 226 n. 6 (1981); *see also Buckley v. Valeo*, 424 U.S. 1, 93 (1976) (stating that "[e]qual protection analysis in the Fifth Amendment area, is the same as that under the Fourteenth Amendment").

The fact that it would be easier for Debtor to discharge the Student Loan if she lived in the First or Eighth Circuits does not mean that her right to equal protection has been violated. The equal protection component of the Fifth Amendment prohibits Congress from enacting a statute that "employs a classification that is inherently invidious or that impinges on fundamental rights." *Schweiker*, 450 U.S. at 230. Among other things, this means that legislation must, at a minimum, "classify the persons it affects in a manner rationally related to legitimate governmental objectives." *Id.*

The equal protection inquiry, therefore, is directed to the provisions of laws enacted by Congress—not to the manner in which those laws are interpreted and applied by the courts. Contrary to Debtor's argument, equal protection does *not* impose upon courts an obligation to interpret legislation enacted by Congress in an identical manner. The structure of the federal judiciary, which is comprised of eleven circuits, guarantees some variation in how laws are interpreted in different circuits. *See, e.g.*, Jonathan M. Cohen and Daniel S. Cohen, *Iron-ing out Circuit Splits: A Proposal for the Use of the Irons Procedure to Prevent and Resolve Circuit Splits Among United States Courts of Appeals*, 108 CAL. L. REV. 989, 992 ("As the courts' caseloads continue to grow, the opportunity for circuit splits grows too. Indeed, there is good reason to believe that the number of circuit splits, including splits in areas of enormous consequence, is also increasing."). This structure—and the inevitable variation in the interpretation of the laws which accompanies it—does not violate equal protection.

Debtor does not assert that any specific provision of § 523(a)(8) runs afoul of her right to equal protection. Debtor's argument is limited to the assertion that the circuit split with respect to

the interpretation of § 523(a)(8) denies her equal protection of the laws. Because the existence of a circuit split does not offend the principles of equal protection, there is no merit to Debtor's argument.

## V. Conclusion

Based upon the foregoing, the Court finds that Debtor is not entitled to a discharge of the Student Loan, and will enter judgment in favor of Defendant.

###

Date: December 29, 2021

Ernest M. Robles
United States Bankruptcy Judge